USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: OCT 2 8 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
  :
UNITED STATES OF AMERICA  :
  :           13 Cr. 58 (KBF)
     -v-  :
  :           OPINION & ORDER
LOUIS BORRERO,  :
                    Defendant.  :
  :
------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

Louis Borrero was indicted on September 30, 2013 in a three-count superseding indictment (the "Indictment"). Count One charges that Borrero conspired to distribute and possess with the intent to distribute one kilogram and more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; Count Two charges that he conspired to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951; and Count Three charges that, in connection with the crimes charged in Counts One and Two, he carried or possessed a firearm, or aided and abetted the same, in violation 18 U.S.C. §§ 924(c)(1)(A)(ii) and (2). (ECF No. 107.) Trial is scheduled to commence on November 4, 2013.

The Government and the defendant have both moved for certain rulings in limine. The Government has requested rulings as to the following:

- Motion 1: to allow the introduction of evidence of the defendant's membership in the Latin Kings gang (the "Latin King Evidence");

- Motion 2: to allow the introduction of certain co-conspirator statements made by Julio and Javion Camacho (the "Camacho Statements"); and

1

- Motion 3: to allow a cooperating witness to testify about statements Borrero made during the pendency of the case (the "Borrero Statements").[1]

The defendant has moved to suppress evidence obtained from his cell phone. (Def. Motion at 1-2, ECF No. 162.) He has also requested immediate production of the prior criminal histories of cooperating witnesses so that his counsel can investigate their prior criminal cases. (Id. at 2-3.) This latter request is not a request for a pre-trial evidentiary ruling as to the admissibility or non-admissibility of evidence at trial. It is therefore not truly a "motion in limine."[2] Nevertheless, the Court addresses this request below.

I. THE CRIMES CHARGED

In the Indictment, the Government asserts that the defendant, along with a number of others, were part of a robbery crew. A leader of the crew was Javion Camacho, with whom Borrero is alleged to have communicated just prior to, and during, the events that form the basis for the crimes charged.

The Government has proffered that the evidence at trial will show that this case arose from a Drug Enforcement Agency ("DEA") investigation that began in

---

[1] The Government also made two additional motions: to preclude the defendant from raising the defenses of impossibility or entrapment; and to preclude cross-examination of a law enforcement agent regarding a disorderly conduct violation and an arrest for drinking while intoxicated. (Gov't Motion at 23-32, ECF No. 149.) The defendant has stated that he does not intend to pursue the entrapment or impossibility defense nor does he intend to cross-examine the law enforcement agent on the two topics mentioned. (Def. Opp. at 2 n.1, ECF No. 167.) Accordingly, these two motions are deemed moot.

[2] The Second Circuit has noted that "[t]he purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotations and citations omitted).

late 2012. In December 2012, a cooperating witness ("CW-1") informed the DEA about an armed robbery crew operating out of New York and New Jersey. The DEA conducted a sting operation in which CW-1 and a confidential informant ("CI-1") met with two members of the crew, Javion Camacho and Jauncey Valle, to discuss a potential robbery. This meeting occurred on December 17, 2012.

During this initial meeting, CI-1 told Javion Camacho that he knew of an incoming shipment of at least ten kilograms of heroin. Camacho allegedly told CI-1 that he and the other members of the crew could rob the shipment and split the heroin with CI-1 and CW-1.

On January 2, 2013, CI-1 met with Camacho and Valle again. At this meeting, they were joined by Camacho's brother, Julio, and another member of the crew. CI-1 recorded this meeting. During this meeting, the participants discussed the crew robbing the heroin shipment; CI-1 stated that the shipment was now estimated to be between 20 and 40 kilograms of heroin.

On January 8, 2013, CI-1 sent a text message to Javion Camacho, informing him that the shipment had arrived and that he and his crew should come to New York City to commit the robbery.

On January 9, 2013, certain members of the crew met at a gas station in New Jersey; Borrero is alleged to have been among them, along with both Camachos and another cooperating witness ("CW-2"). At that meeting, Javion Camacho told CW-2 that Borrero was one of Camacho's Latin King "brothers"; CW-2, not himself a member of the Latin Kings, recognized a Latin King tattoo under one of Borrero's

3

eyes. Camacho is also alleged to have told CW-2 that "this" is what Borrero did, and that Borrero "gets busy." Julio Camacho told CW-2 that Borrero was "wild" and "put in work." CW-2 will testify that he understood these statements to mean that Borrero was an aggressive and important member of the crew. According to CW-2, Javion Camacho then told those present the plan for the robbery.

The Government will offer additional evidence relating to other events on January 9, 2013, including Borrero texting another co-conspirator regarding what was understood to be a gun. Members of the crew then drove to New York City. Borrero was in a car with the Camachos and a co-conspirator, Joshua Roman. On their way to what they believed to be the site of the robbery, the crew was arrested by the DEA.

Following his arrest, the FBI photographed Borrero. Those photographs show the tattoo mentioned by CW-1. In addition, Borrero also has a tattoo "King" on his shoulder and tattoos "K. Lucci" and "Louchie." In a post-arrest statement, Borrero admitted that "Luche" was an alias. Borrero is listed in Javion Camacho's cell phone contacts as "Louche."

Post-arrest and while waiting to appear in court, CW-2 and Borrero were in a cellblock together. Borrero told CW-2 that, in substance, the Camachos were the defendants who dealt with the Government informants and should "take the weight" and say that none of the other members of the crew knew anything. According to the Government, CW-2 did not elicit these statements based on any direction or encouragement from the Government.

II.  THE GOVERNMENT'S MOTIONS IN LIMINE

   A. Motion 1: Latin Kings Evidence

The Government seeks to introduce evidence through a cooperating witness ("CW-2") that co-conspirators Julio and Javion Camacho referred to Borrero as a Latin King brother, and regarding photographs of tattoos Borrero has and which a witness would state indicated membership in that gang.

In his opposition to the admissibility of such evidence, the defendant does not address the issue of whether Borrero is or is not a member of the Latin Kings. Nor need he. Instead, the defendant argues that such evidence is both irrelevant to the crimes charged and therefore should be precluded under Rule 401 of the Federal Rules of Evidence and, even if relevant, should be precluded under Rule 403 as unfairly prejudicial.

Rule 401 defines "relevant evidence" as evidence that has "any tendency" to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401.[3]

The Government argues that the Camachos' reference to Borrero as a Latin King "brother" and regarding his Latin King tattoos is relevant to the existence of the conspiracy and the relationship of mutual trust between them. The Government asserts that shared membership in the Latin Kings provides direct evidence of how Borrero came to join the charged conspiracy. Further, the

---

[3] In a conspiracy case, it has long been settled law that the acts and declarations of one conspirator are admissible against another if they occur during the course of, and in furtherance of, the conspiracy. Pinkerton v. United States, 328 U.S. 640, 647 (1946).

5

Government argues that this evidence is admissible to corroborate Borrero's identity as a participant in the January 9 meeting at the gas station.

Based upon the Government's proffer, the Court agrees that the Latin King Evidence would have some probative value. However, that probative value is, in this instance, outweighed by the unfair prejudice that necessarily accompanies association with the Latin Kings.

Under Rule 403, evidence, although relevant, may be precluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403. While it is true that any evidence probative of guilt is prejudicial in some sense, Rule 403 is designed to protect against some adverse effect that goes beyond tending to prove the fact or issue that justified its admission. United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995); see also United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).

Here, it is possible for most of the conversation and even the identifying markings to come in to evidence without any need to mention association with the Latin Kings. For instance, CW-1 can testify, as a co-conspirator statement, that Javion Camacho referred to Borrero as a "brother"—which he can state he believed meant a close and trusted person—and to the remaining statements regarding Borrero allegedly being "wild," that he "put in work," and "gets busy," which need not be associated with gang membership to tell the story the Government intends to tell. Finally, CW-2's identification of the tattoo is sufficient to corroborate that

6

Borrero was the person whom CW-2 saw at the January 9 meeting—it is unnecessary to connect that tattoo to membership in the Latin Kings for the point to be made.

There is no doubt that introducing Borrero's membership (alleged or real) into the Latin Kings would add a significant new dimension to this case. The Latin Kings are a gang known by many to be associated with high levels of crime and violence. Indeed, membership in the Latin Kings could be associated (rightly or wrongly) with significant criminal behavior. While certainly being part of a robbery crew is not inconsistent with Latin Kings membership, it is not the case that Latin Kings membership necessarily means that the defendant was inclined to commit this crime, at this time, in this place, or at all.

Rule 403 was intended for just this sort of situation, where the facts of the crimes charged need not be associated with evidence that would suggest to the jury that they have before them a man guilty by association with a known gang. Defending himself against the charge of being a member of the Latin Kings is almost impossible without also relinquishing the defendant's constitutional right to testify. There is no membership list to which he can point, there is no president of the organization whom he could call as a witness in this federal prosecution. Thus, the charge would be before the jury, unrebutted. There is a significant possibility that, in this case, at least one or more members of the jury could not help but to assume that a member of the Latin Kings would be more likely than not to engage

in criminal behavior. This also potentially shifts part of the Government's burden of proof at trial.

There may well be cases in which proof of Latin Kings membership is in fact necessary to show trust and association, or some other fact. This is not one of them. There are two eyewitnesses, CW-1 and CW-2, who will place the defendant at places relevant to the conspiracy and acts charged. The value of the Latin King Evidence under these particular circumstances is substantially outweighed by the possibility of unfair prejudice.

Accordingly, the Latin King Evidence is precluded.

### B. Motion 2: The Camacho Statements

#### 1. Rule 801(d)(2)(E)

Borrero was indicted for conspiracy to commit Hobbs Act robberies with the Camachos (Count Two); he is charged with being a co-conspirator, and witnesses will testify that he was in fact a co-conspirator. On these facts, the Camacho Statements are offered pursuant to Federal Rule of Evidence 801(d)(2)(E) as co-conspirator statements.

In order to constitute an admissible co-conspirator statement, the statement proffered must have both occurred during the course of the conspiracy, and have been in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).

Defendant argues that the Camacho Statements were not made in furtherance of the conspiracy because they are more akin to a type of narrative

8

statement. See United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir. 1999). "[I]dle chatter among conspirators does not satisfy the 'in furtherance' requirement of Rule 801(d)(2)(E)." Gigante, 166 F.3d at 82. According to the defendant, statements such as calling Borrero a "brother," stating that "this is" what he does, that he is "wild," "gets busy," and "puts in work" are merely a narrative description of the conspiracy. This Court disagrees.

In the context of the crimes here charged, the statements of leaders of the robbery crew, describing the skills and qualities of a member of that crew, is more than idle chatter or mere description—it is promotion of the robbery crew. The statements are plainly designed to assure other potential crew members of the strengths and skill sets of crew members. The Government argues that the statements were also intended to engender trust by CW-2.

### 2. Rule 404(b)

The Camacho Statements certainly implicate the Camachos' knowledge of Borrero's skills—knowledge inferentially based on past experience. This, in turn, necessarily implicates conduct outside of that charged in the Indictment and so-called "other crimes" evidence.

Under Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence may be admissible if introduced for the purpose of showing "motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); see also United States v. Pipola, 83 F.3d 556, 565 (2d Cir. 1996). The Second Circuit has an inclusionary view of this rule and allows in such evidence so long as it is not admitted to prove criminal propensity. See id.; see also Berkovich v. Hicks, 922 F.2d 1018, 1022 (2d Cir. 1991).

The Second Circuit has held that one legitimate purpose for admitting such evidence is to explain how a criminal relationship developed. Pipola, 83 F.3d at 566; United States v. Lasanta, 978 F.2d 1300, 1307-08 (2d Cir. 1992).

The Court finds that the Camacho Statements meet the relevance test under Rule 401 and also should not be precluded under Rule 403. These statements are needed to explain the basis of the relationship and provides background for the jury's understanding as to how and why there is trust by the Camachos in Borrero's skills. Under such circumstances, the statements are admissible despite their necessary implications. See Pipola, 83 F.3d at 566; United States v. Prince, 445 F. App'x 419, 420-21 (2d Cir. 2011) (testimony about the defendant's past drug-related activity properly admitted in robbery conspiracy prosecution to shown criminal relationship and mutual trust between coconspirators). Further, evidence of uncharged crimes can be used to rebut a defense that the defendant was "merely present," by showing that he had knowledge and intent. United States v. Gadsden,

300 F. App'x 108, 110 (2d Cir. 2008); United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994); United States v. Bruno, 873 F.2d 555, 561-62 (2d Cir. 1989).[4]

In this case, the co-conspirator statements mentioned above are intertwined with knowledge about Borrero's abilities and trustworthiness based on past experience. They are, therefore, admissible against Borrero for purposes other than to show criminal propensity.

### C. Motion 3: The Borrero Statements

CW-2 is expected to testify that during the pendency of the case, and while in a cellblock together, Borrero told him that since the Camachos were the ones who had dealt with the Government informants, they should "take the weight" and say that the other members of the crew did not know anything. Defendant asks that this Court hold a hearing, under Massiah v. United States, 377 U.S. 201 (1964), to determine whether CW-2 was functioning as a Government agent when he heard Borrero make this statement.

The Supreme Court has held that a defendant's Sixth Amendment right to counsel in a criminal case is violated if the prosecution seeks to use jailhouse informants to conduct surreptitious investigations. Massiah, 377 U.S. 201, 205-06. Accordingly, it is unlawful for the government to intentionally use a jailhouse informant to do that which it cannot do—question the witness and seek incriminating statements, outside the presence of counsel. See United States v. Stevens, 83 F.3d 60, 64 (2d Cir. 1996). The question is not necessarily whether the

---

[4] In a footnote, the Government notes that it intends to have CW-2 testify that he committed other robberies with the crew, including with the Camachos and Joshua Roman. There is no indication that CW-2 will testify that he previously committed robberies with Borrero.

11

Government set up the meeting, but whether it exploited a situation it knew to exist. See United States v. Henry, 447 U.S. 264, 273-74 (1980).

The defendant argues that he has received limited information from the Government as to when and how the Borrero Statements were made, and that he cannot determine from the record whether the Government engineered the situation. Receipt of the Jencks Act or 3500 material—which the defendant will have as of November 1—may answer this question.

The Court will reserve on this question until the defendant has had an opportunity to review the Jencks Act or 3500 material relevant to this communication. After defendant has reviewed such material, if he is concerned that the Government may have engineered the situation, he may raise this motion again.

### III. THE DEFENDANT'S MOTION TO SUPPRESS

On January 9, 2013, the defendant was arrested along with 15 other individuals. Approximately 21 cellphones were seized at that time. The Government had obtained consent from one of the defendants, Victor Moral, to search the contents of his cellphones. In reliance on this consent, the Government in fact searched those phones it believed were associated with Moral. As it turned out, Borrero's cellphone had been incorrectly associated with Moral and it was therefore initially searched based on Moral's consent.

On February 4, 2013, the DEA obtained a search warrant with respect to 17 of these cellphones—those for which it did not have consent. None of the

information contained in the affidavit supporting the search warrant was derived from the search of Borrero's cellphone. On its face, the affidavit in support of the warrant is limited to the events of late December 2012 up to and including the arrest on January 9, 2013.

In the weeks leading up to the trial in this matter, the Government discovered its error. The day after it learned of its error, the Government sought and obtained a search warrant for Borrero's cellphone from Magistrate Judge Gabriel Gorenstein. The affidavit submitted in support of this warrant was not based on or derived from any information contained in the Borrero cellphone. (See Gov't Opp. Ex. B.) The October 8, 2013 affidavit simply repeated the very same facts previously set forth in support of the February 4, 2013 warrant. In addition, the affidavit submitted to Judge Gorenstein recited that the cellphone had previously been searched without a warrant based on the events described above.

Borrero argues that the Government's search of his cellphone violated his Fourth Amendment right to be free from unreasonable search and seizure, see U.S. Const. amend. IV, and he has moved to suppress all physical evidence based on the search of that phone or derived therefrom.

The Government argues that, under the circumstances here, suppression is unwarranted. In sum, the Government argues that there is no doubt that it could have obtained—and in fact later did obtain—a warrant to search Borrero's cellphone. The Government also argues that the Fourth Amendment is not

13

intended to require the exclusion of evidence that was otherwise obtainable without such a violation. United States v. Marchand, 564 F.2d 983, 994-95 (2d Cir. 1977).

"Under the doctrine of inevitable discovery, evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation." United States v. Roberts, 852 F.2d 671, 675-76 (2d Cir. 1988) (internal quotations omitted) (citing Nix v. Williams, 467 U.S. 431, 447 (1984)). To avoid suppression under this doctrine, the district court must determine, based on the facts in existence at the moment prior to the unlawful search, what would have happened had the unlawful search not occurred. United States v. Eng, 997 F.2d 987, 990 (2d Cir. 1993). The inevitable discovery doctrine requires that the district court determine whether the disputed evidence would have been discovered but for the constitutional violation; if the answer is "yes," then such evidence will not be excluded. United States v. Heath, 455 F.3d 52, 56 (2d Cir. 2002).

Here, the inevitable discovery doctrine plainly applies. On the documentary record before this Court alone there is no doubt that the Government could have obtained a warrant to search Borrero's cellphone based solely on information existing prior to the unlawful search; and in fact, that is proven by the fact that the Government did obtain a warrant based on those same facts. Thus, this Court can state with a high level of confidence that the inevitable discovery doctrine applies

14

here and the contents of the cellphone would not be excluded based on a Fourth Amendment violation.

In addition, however, the Government argues that the "independent source doctrine" separately supports the admission of what would otherwise be excludable evidence. Under this doctrine, evidence may be admissible when law enforcement obtains a valid search warrant (as they did here) based on sources entirely unconnected to the unlawful search (as was the case here where the warrant was based on facts up to the time of arrest). See United States v. Bonczek, 391 F. App'x 21, 24 (2d Cir. 2010); see also Segura v. United States, 468 U.S. 796, 814 (1984). To apply the exclusionary rule in such a situation would put law enforcement in a worse position than they would be in the absence of a violation. United States v. Vilar, 530 F. Supp. 2d 616, 632 (S.D.N.Y. 2008), aff'd in part and rev'd in part on other grounds, 729 F.3d 62 (2d Cir. 2013).

Here, because the recent October 2013 warrant was obtained from those facts which were used to obtain warrants for the other cellphones collected during the same arrest, from the co-defendants arrested at the time, the independent source doctrine provides a second and entirely appropriate basis on which to avoid exclusion of such evidence. It would be odd indeed if the mere happenstance of an erroneous inventory of a cellphone as to which there can be no doubt a warrant could have been obtained, and subsequently was obtained, could result in exclusion. That would privilege form over substance, which is not the purpose or intent of either the Fourth Amendment or the interpreting case law.

Accordingly, defendant's motion to preclude is denied.

## IV. THE DEFENDANT'S MOTION FOR IMMEDIATE PRODUCTION OF CRIMINAL HISTORIES FOR COOPERATING WITNESSES

The defendant argues that material relating to the criminal histories of any testifying cooperating witnesses constitutes Brady and Giglio material that should be immediately produced by the Government so that he can conduct a reasonable investigation and develop cross-examination. This rationale would apply in every case—this case presents no unusual circumstances that suggest the Court should vary from normal procedure. The case law supports production of these materials on the schedule set here—and indeed, at this time, the Government has made such production already. This motion is therefore moot. See, e.g., United States v. Coppa, 267 F.3d 132, 146 (2d Cir. 2001); see also United States v. Nixon, 418 U.S. 683, 701 (1974). The Government can do no more, and need not have done more, than that which is now done.

## V. CONCLUSION

For the reasons set forth above, the Government's motions in limine are GRANTED in part and DENIED in part; the defendant's motions are DENIED. The Clerk of Court is directed to terminate the motions at ECF Nos. 148 and 162.

SO ORDERED.

Dated:   New York, New York
         October 28, 2013

_____
KATHERINE B. FORREST
United States District Judge

16